UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
| N.H., *et al.*, | ) | Case No.  5:21-cv-1034 |
|  | ) |  |
| Plaintiffs, | ) |  |
|  | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| v. | ) |  |
|  | ) |  |
| DYLAN SOISSON, *et al.*, | ) | **MEMORANDUM OPINION** |
|  | ) | **AND ORDER** |
| Defendants. | ) |  |

This is an action brought under Section 1983 and Ohio law by a minor and her mother against Officer Dylan Officer Soisson and the Village of Lakemore. (Doc. No. 31-1.) The defendants moved for summary judgment. (Doc. Nos. 32 & 37.) The plaintiffs later moved to strike certain evidence and sought leave to file a sur-reply in response to Officer Soisson's arguments on reply. (Doc. Nos. 42 & 48.) This Order resolves all pending motions.

I.  **Facts**

On the evening of June 5, 2020, Officer Soisson was on duty in the Village of Lakemore. He responded to a call for assistance from another officer at a local skating rink. (Doc. No. 39-1 at PageID 386-87.) When Officer Soisson arrived, another officer was there outside along with a handcuffed African American female juvenile (the "juvenile suspect"). She was suspected of being involved in a fight at the rink. (*Id.* at 389-90 & 399.) A white female juvenile ("detained juvenile"), also handcuffed, was sitting in a police car. (*Id.* at 390-91.) Officer Soisson spoke to the detained juvenile, and then assisted other officers with the investigation. (*Id.*)

The juvenile suspect was released to her parent. Afterward, Officer Soisson and other officers viewed a mobile phone video showing part of the earlier incident. In Officer Soisson's

words during deposition, "it wasn't just a fight, it was a beat down," and the detained juvenile's mother came to the scene and was irate.  (*Id.* at 393.)  Other officers apparently did not receive any contact information for the juvenile suspect.  (*Id.*)  The detained juvenile's mother saw the video and told officers that she believed what happened to her daughter was an assault.  (Soisson Body Camera Footage ("Soisson Body Cam.") at 17:40.)

The detained juvenile told police that the juvenile suspect's cousin was still inside the rink.  Officer Soisson asked her to accompany him into the rink to point out the juvenile suspect's cousin.  Officer Soisson wanted to ask the cousin for the juvenile suspect's phone number.  (*Id.* at 393-94; Soisson Body Cam at 22:10; Doc. No. 39-1 at PageID 394.)

Inside the rink, N.H. was identified as the cousin. (*Id.* at 394.)  Officer Soisson asked N.H. to step into the breezeway.  She complied.  N.H. was 13 years old.  (Doc. No. 42 at PageID 1016.)

Officer Soisson asked to speak with her.  He told N.H. that she was not in trouble.  (Soisson Body Cam at 22:39.)  While asking about her cousin's phone number, Officer Soisson observed a vaping device (or vape pen) in N.H.'s hand.  (*Id.*; *see also id.* 23:10.)  Officer Soisson asked "can I have the vape, too?"  N.H. initially became indignant.  She claimed she had not "hit it" (*i.e.,* smoked).  N.H. asked "am I going to get it back?"  N.H. also asked "why?" – to which Officer Soisson responded "because how old are you?"  "Old enough," N.H. replied.  (23:10-28.)

N.H. testified in deposition that she was confused because Officer Soisson "came up to me to ask me about my cousin, not to approach me about the vape."  (Doc. No. 34-2 at PageID 233.)  N.H. acknowledged that Officer Soisson would not have seen or known about the vape until he saw her holding it.  N.H. also testified that Officer Soisson did not know that "other kids in the skating rink had vapes also."  (*Id.* at PageID 234.)

Q:      Okay.  So Officer Soisson sees you with the vape in your hand and asks you
        to give it to him and you didn't want to give it to him, right?

A:      Correct.

(*Id.*)  N.H. admitted that her friend standing next to her (who N.H. claimed also owned a vape)

did not have the vape in her hand or in view.  (*Id.* at PageID 236.)

N.H. handed the vape pen to Officer Soisson.  (Soisson Body Cam at 23:28.)  Officer

Soisson said "do you want to get arrested?  This is illegal."   In deposition, N.H. admitted:

Q:      Did you know that possession of a vape was illegal?

A:      Yes.

Q:      The vape was full of a liquid, is that correct?

A:      Yes.

(Doc. No. 34-2 at PageID 236.)

N.H. turned and began to walk away from Officer Soisson.  He told N.H. not to walk

away.  (Soisson Body Cam 23:55.)  As N.H. recounted during her deposition: "I walked away

and [the friend] tried to stop me but I kept walking and that's when the officer grabbed me and

like forced me and just put me in handcuffs."  (Doc. No. 34-2 at PageID 236.)

Officer Soisson testified that after he obtained the vape, he told N.H. not to walk away

and that she needed to step outside.  He testified that N.H. disobeyed his lawful command to step

outside.  When asked why N.H. needed to step outside, Officer Soisson testified "[b]ecause now

I need her information as well as her mother's information . . . [b]ecause she was in possession

of a vape."  (Doc. No. 39-1 at PageID 423.)

Officer Soisson testified that possession of a vape by a minor was "an arrestable offense"

based on his "training and experience."  (*Id.*)  "We've had multiple reports and calls at the

Springfield High School for vapes, where they get charged with it; we've had multiple incidents

at the skating rink where juveniles have been charged with it; and the Ohio Revised Code." (*Id.*) Officer Soisson believed it was a minor misdemeanor. (*Id.* at PageID 424.)

Officer Soisson said "let's go outside." He put his left hand on N.H.'s left arm, put his right hand under her shoulder blade, and escorted her through the doorway. (24:00-24:10.) Officer Soisson's body camera footage shows that he physically escorted her out of the rink, but that N.H. remained on her feet, did not fall over, and did not bump into anything. (24:00-24:10.)

Once outside, Officer Soisson told N.H. to put her hands behind her back. (24:08.) N.H. did not comply. Officer Soisson grabbed her left wrist and put her arm behind her. (24:10.) N.H. told her friend to call her mother. (24:11.)

After handcuffing N.H., Officer Soisson directed N.H. to a marked police car. (24:44.) The body camera evidence shows N.H. stepped into the vehicle. (24:45.) N.H. testified that Officer Soisson had one of his hands above her head and the other on the cuffs as she got into the car. "But I still got in on my own, yes. He didn't completely force me." (Doc. No. 34-2 at PageID 239.) After instructing N.H. to put her feet inside the car, Officer Soisson shut the door. (24:55.)

Officer Soisson walked over and spoke to the victim's mother. (25:20.) N.H.'s friend approached Officer Soisson and told him that she had T.H., N.H.'s mother, on the phone. (26:57.) Officer Soisson spoke to T.H., mentioning that N.H. had a vape pen in her hand. (27:30.) He informed her that someone needed to come pick up N.H. (27:40.) After speaking to T.H., Officer Soisson spoke to N.H.'s friend and said "she's not arrested" and "she just needs to leave." (28:00-15.) Officer Soisson is heard on his body cam also saying that N.H. was in the car "because she wants to scream and holler and walk away from me." (28:27.)

4

In his deposition, Officer Soisson testified that once N.H. was in the car, she was under arrest for possession of the vape and for disobeying his lawful commands.  (Doc. No. 39-1 at PageID 423.)

When asked in deposition about being in the police car, N.H. answered: "I don't know how long I was in there."  (Doc. No. 34-2 at PageID 240.)  Officer Soisson estimated that N.H. was in the car for around 20 minutes while she waited for someone to pick her up.  (Doc. No. 39-1 at PageID 435 & 436-37.)

N.H. testified: "I asked him to turn the air on or roll my window down and that's when he came in the front seat and turned the heat up, turned it up.  And then after that it's like I passed out.  Like I don't remember after he turned the heat up."  (Doc. No. 34-2 at PageID 240.) Officer Soisson denied turning on or turning up the heat in the police car.  (Doc. No. 39-1 at PageID 433-34.)

T.H. did not come to the rink.  Officer Soisson had N.H.'s friend call T.H. to obtain permission for N.H. to go home with another adult.  When that adult arrived, Officer Soisson opened the police car for N.H. to exit and removed the handcuffs from N.H.  (Doc. No. 39-1 at PageID 440-41.)  When N.H. was out of the car, Officer Soisson testified that he said "All you have to do is listen.  I'm not charging you with anything."  (*Id.* at 441.)  N.H. left with her friend and friend's aunt.

T.H. is also a plaintiff in this action.  In addition to the two times Officer Soisson called her on June 5, 2020, T.H. testified Officer Soisson called her again that night and said "please don't tell my captain.  I don't want to lose my job."  (Doc. No. 34-1 at PageID 184.)

Officer Soisson denied making the third call.  He claimed that N.H. and/or her friend called police dispatch regarding the incident that night, and dispatch put the incoming call

through to Officer Soisson, who was still on duty.  (Doc. No. 39-1 at PageID 455-56 & 460.)  He recounted that the caller(s) asked for his name and badge number.  Officer Soisson denied making any apology or pleas at any time to either N.H. or T.H.  (*See id.*)

## II.  Law and Analysis

### A.  Standard

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought."  Fed. R. Civ. P. 56(a). "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  The moving party bears the burden of showing that no genuine issues of material fact exist."  *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021) (citations and quotations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Mining Mach., Inc. v. Copley*, 145 F. App'x 149, 152 (6th Cir. 2005) ("The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact.").

A "material" fact is one that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  And a genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Abu-Joudeh v. Schneider*, 954 F.3d 842, 849-50 (6th Cir. 2020) (additional citations and quotations omitted).

"Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact."  *Queen v. City of Bowling Green, Kentucky*, 956 F.3d 893, 898 (6th Cir. 2020) (quotation and citations omitted).  "[O]n summary

judgment the inferences to be drawn from the underlying facts...must be viewed in the light most favorable to the party opposing the motion." *Id*.; *see also Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.,* 395 F.3d 338, 342 (6th Cir. 2005).

A party asserting (or disputing) a fact must cite evidence in the record or show that the record establishes the absence (or the presence) of a genuine dispute. See Fed. R. Civ. P. 56(c) and (e). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.").

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the Court's role is not to make credibility determinations or 'weigh' conflicting evidence. *Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014); *Arban v. W. Pub. Corp.*, 345 F.3d 390, 400 (6th Cir. 2003). "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Payne*, 767 F.3d at 530.

### B.  Federal Claims Against Officer Soisson

Plaintiffs asserted six causes of action against Officer Soisson: excessive force under the Fourth and Fourteenth Amendments (Count One); unlawful seizure under the Fourth Amendment (Count Two); equal protection violation under the Fourteenth Amendment (Count

Three); assault and battery (Count Five); intentional infliction of emotional distress (Count Six); and loss of consortium (Count Seven).[1]

Plaintiffs' federal claims in Counts One through Three were asserted under 42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and the laws of the United States, and must show that the alleged deprivation was committed by a person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). The parties do not dispute that Officer Soisson was on duty and acting under color of law during the events described in the Complaint.

### 1. Qualified Immunity Standard

Officer Soisson raised a qualified immunity defense. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stoudemire v. Michigan Dep't of Corr.*, 705 F.3d 560, 567 (6th Cir. 2013) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)) (brackets and internal quotations omitted); *see also Pearson v. Callahan,* 555 U.S. 223, 232 (2009). Qualified immunity "gives government officials "breathing room to make reasonable but mistaken judgments," and "protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (cleaned up) (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 743 (2011)). Courts must evaluate "the facts and circumstance of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight." *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007).

---

[1] Count Four is a claim for failure to properly train and supervise against the Village of Lakemore only.

"Qualified immunity protects state officers against section 1983 claims unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time of the offense.  And the burden lies with the plaintiff to show each prong."  *Novak v. City of Parma, Ohio*, 33 F.4th 296, 303 (6th Cir. 2022) (quotations and citations omitted), *cert. denied*, 143 S. Ct. 773 (2023).  Aspects of the two prongs can overlap. *See Siegert v. Gilley*, 500 U.S. 226, 232 (1991) ("A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all.").  Failure to demonstrate either prong warrants judgment for the defendant.  *See Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009).  A "'substantive' rejection of plaintiff's claim effectively disposes of the qualified immunity issue." *Zilich v. Longo*, 34 F.3d 359, 364 (6th Cir. 1994).

If an officer's actions were not clearly afoul of constitutional principles, the plaintiff "must identify a case that puts [the officer] on notice that his specific conduct was unlawful." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021).  The Supreme Court has –

> repeatedly told courts not to define clearly established law at too high a level of generality.  It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  Such specificity is especially important in the Fourth Amendment context, where it is sometimes difficult for an officer to determine how the relevant legal doctrine [ ] will apply to the factual situation the officer confronts.

*City of Tahlequah, Oklahoma v. Bond*, 142 S. Ct. 9, 11-12 (2021) (quotations and citations omitted).

The Supreme Court and Sixth Circuit have held that local officials who enforce a law as written are entitled to qualified immunity – except in the extraordinary situation where the law was grossly unconstitutional on its face.  "When public officials implement validly enacted state

9

laws that no court has invalidated, their conduct typically satisfies the core [qualified immunity] inquiry – the objective reasonableness of an official's conduct – that the immunity doctrine was designed to test." *Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440-41 (6th Cir. 2016) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).  A local official who "acted in the face of legislative action (a duly enacted, presumptively constitutional law) and judicial inaction (the absence of an on-point decision making the law unconstitutional) . . . did not violate clearly established law or otherwise act unreasonably" by enforcing that law.  *Id.* at 441.  "Police are charged to enforce laws until and unless they are declared unconstitutional. . . .  Society would be ill-served if its police officers took it upon themselves to determine which laws are and which are not constitutionally entitled to enforcement." *Michigan v. DeFillippo*, 443 U.S. 31, 37-38 (1979).  Citing *DeFillippo* and later decisions, the Sixth Circuit observed in 2016 that "the Supreme Court has *never* denied qualified immunity to a public official who enforced a properly enacted statute that no court had invalidated.  This indeed would seem to be the paradigmatic way of showing objectively reasonable conduct by a public official." *Citizens in Charge*, 810 F.3d at 441 (emphasis in original).

## 2.  The Mother's § 1983 Claims

T.H. raised Section 1983 claims in Counts One through Three alleging that her daughter N.H.'s constitutional rights were violated.

"By its own terminology, the statute grants the cause of action 'to the party injured.' Accordingly, it is an action *personal* to the injured party." *Jaco v. Bloechle*, 739 F.2d 239, 241 (6th Cir. 1984) (emphasis in original); *see also LeFever v. Ferguson,* 645 F. App'x 438, 447 (6th Cir. 2016).  That means "a minor's personal cause of action is her own and does not belong to her parent or representative." *Shepherd v. Wellman*, 313 F.3d 963, 970 (6th Cir. 2002).

There were no allegations of any personal harm to T.H. resulting from conduct alleged in those counts.  T.H. was not at the skating rink on June 5, 2020.  T.H. was neither seized nor subjected to force, so she has no Fourth Amendment claim.  *Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014) ("Fourth Amendment rights are personal rights which . . . may not be vicariously asserted.") (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)).  The Equal Protection claim specifically addresses the alleged disparate treatment of children based on race.  T.H. is neither a child, nor was she subjected to the physical treatment described in the Equal Protection claim.

Accordingly, T.H.'s claims in Counts One through Three are dismissed.

### 3.  Fourth Amendment – Unlawful Seizure

N.H. argued that Officer Soisson violated her Fourth Amendment rights by subjecting her to an unreasonable search followed by an unlawful seizure and arrest.  Officer Soisson detained her despite not charging her.  N.H. argued that she "had committed no crime."  (Doc. No. 31-1 ¶ 51.)

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. "The guarantee, all agree, requires probable cause for an arrest."  *Barrera v. City of Mount Pleasant*, 12 F.4th 617, 620 (6th Cir. 2021).

> Police and citizens may have three types of permissible encounters: (1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause.

*United States v. Davis*, 514 F.3d 596, 607 (6th Cir. 2008) (quoting *United States v. Waldon*, 206 F.3d 597, 602 (6th Cir. 2000)).

This encounter began with Officer Soisson approaching N.H. to ask for her cousin's contact information.  "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002); *see also Hiibel v. Sixth Judicial Dist. Ct. of Nev.*, 542 U.S. 177, 185-86 (2004) ("In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment.").  And "simply calling out to someone to come over to talk does not constitute a seizure." *United States v. Matthews*, 278 F.3d 560, 561-62 (6th Cir. 2002) (reasoning that officer yelling, "Hey, buddy, come here" was not an order or a detention but rather a consensual "request that he come hither") (abrogated on other grounds by *United States v. McMurray*, 653 F.3d 657 (6th Cir. 2011)); *see also Mitchell v. United States*, 233 F. App'x 547, 549-51 (6th Cir. 2007); *United States v. Foster*, 376 F.3d 577, 581-84 (6th Cir. 2004); *United States v. Peters*, 194 F.3d 692, 698 (6th Cir. 1999).

"The second type of encounter follows the framework of *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny." *Id.  Cf. Brown v. Ashton*, 93 Md. App. 25, 30, 611 A.2d 599, 601 (1992), *vacated on other grounds*, 339 Md. 70, 660 A.2d 447 (1995) (holding that police did not violate the Fourth Amendment where they subjected a minor who looked young to an investigatory detention to ascertain whether the minor was in violation of a curfew statute); *People v. Smith*, 276 N.W.2d 481, 484 (Mich. Ct. App. 1979) (holding that police may conduct an investigatory stop after curfew to determine a minor's age).

A consensual police encounter becomes a seizure when a person's freedom of movement is limited "by means of physical force or a show of authority." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980).  In other words, a person is seized when a reasonable person would not

believe they were free to leave or to disregard the officer's requests. *United States v. Richardson*, 385 F.3d 625, 629 (6th Cir. 2004). A person is not seized for Fourth Amendment purposes until they submit to the officer's show of authority. *United States v. Johnson*, 620 F.3d 685, 690 (6th Cir. 2010).

Officer Soisson approached N.H. and asked questions about her cousin. N.H. began to walk away. During that interaction, Officer Soisson saw something in plain view that presented new circumstances: N.H. was holding a vaping device. (Doc. No. 31-1 at PageID 139, ¶ 27.) Officer Soisson asked N.H. "how old are you?" He also asked, "can I have the vape?" (*See* Soisson Body Cam at 23:10-28.) N.H. handed the vape to Officer Soisson.

Under Ohio law, "[n]o child shall do any of the following unless accompanied by a parent, spouse, or legal guardian of the child . . . [u]se, consume, or possess tobacco products . . . ." Ohio Rev. Code § 2151.87(B)(1). Officer Soisson pointed out in briefing that the prohibition on possession by a minor in Section 2151.87(A) of the Revised Code adopted the definition of a tobacco product from Section 2927.02. *See generally* Ohio Rev. Code §§ 2927.02(7) & 2927.02(8). (Doc. No. 37 at PageID 302.) N.H. agreed with that definitional point. (*See* Doc. No. 42 at PageID 1023 n.5 ("RC 2151.87, attached as App. B, incorporates RC § 2927.02(A)(8)'s definition of 'tobacco product,' which includes electronic smoking devices.").) Further, N.H. pled that she possessed the vaping device, which she acknowledged in her opposition brief constituted possession of a tobacco product within the meaning of Section 2151.87. (*See* Doc. No. 31-1 at PageID 139, ¶ 27; Doc. No. 42 at PageID 1023.)

The Fourth Amendment permitted Officer Soisson to seize the device. "[T]he 'plain view' doctrine has been applied where a police officer is not searching for evidence against the accused, but nonetheless inadvertently comes across an incriminating object." *Horton v.*

*California*, 496 U.S. 128, 135 (1990). A warrantless seizure of an item is permitted under the Fourth Amendment where an officer is lawfully in a place where he sees an item in plain view, can lawfully access the item, and the item's incriminating character is immediately apparent. *See id*. at 136-37; *see also Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993); *Payton v. New York*, 445 U.S. 573, 586-87 (1980); *United States v. Reed*, 141 F.3d 644, 649 (6th Cir. 1998) ("contraband in plain view may be seized if legally accessed").

In light of N.H.'s youthful appearance and the vaping device in the open, there was reasonable suspicion of underage tobacco possession. Requiring N.H. to stay there and answer questions about her age was permissible. It was a paradigmatic *Terry* stop. Applying the plain view considerations here, Officer Soisson's seizure of the device did not violate the Fourth Amendment.

N.H. argued that she was not subject to criminal prosecution for such possession under Section 2151.87(B)(1) of the Revised Code. She was correct on that point. *See id.* While other tobacco infractions may result in the imposition of community service, her possession alone would not. *See* Ohio Rev. Code § 2151.87(F).[2]

Still, however, Officer Soisson observed N.H. to be in apparent "violation of division (B)." Ohio Rev. Code § 2151.87(E). Ohio law authorized Officer Soisson to detain N.H. and/or to seize the vaping device in these circumstances. "A child may be taken into custody . . . [b]y a law enforcement officer . . . when . . . [t]here are reasonable grounds to believe that the conduct, conditions, or surroundings of the child are endangering the health, welfare, or safety of the

---

[2] Community service could be imposed for violation of Section 2151.87 subsection (C), which prohibits a minor from giving false information to buy or acquire tobacco products. *See* Ohio Rev. Code § 2151.87(F). Possession by a minor is prohibited by subsection (B), not (C).

14

child." Ohio Rev. Code § 2151.31(A)(6)(a).  Tobacco consumption by an unaccompanied minor

constitutes such a danger.  *See id.* § 2151.87(B)(1).

> Any cigarettes, other tobacco products, alternative nicotine products, . . . that are
> given, sold, *or otherwise distributed* to a person under twenty-one years of age in
> violation of this section *and that are used, possessed*, . . . by a person under twenty-
> one years of age in violation of section 2151.87 of the Revised Code *are subject to
> seizure* and forfeiture as contraband under Chapter 2981 of the Revised Code.

Ohio Rev. Code § 2927.02(G) (emphasis added).  These provisions of Ohio law are not

contingent upon the minor being subject to criminal punishment.  So N.H.'s view regarding the

non-criminal nature of Section 2151.87(B)(1) did not preclude Officer Soisson from stopping

and questioning N.H. or from seizing the vaping device.

N.H. made much of Officer Soisson's view that a minor's violation of Section

2151.87(B)(1) constituted a criminal misdemeanor.  (*See* Doc. No. 45 at PageID 1117 (citing

Ohio Rev. Code § 2901.08(G)).)  N.H. urged that Officer Soisson was incorrect in his

characterization of Ohio law.  (*Id.*)  It is true that Ohio treats juvenile code offenses as civil

violations rather than criminal violations.  *See In re Anderson*, 748 N.E.2d 67, 70 (Ohio 2001).

Nonetheless, the Ohio Supreme Court itself "recognize[d] that there are criminal aspects to

juvenile court proceedings."  *Id.* at 69.  "Little, indeed, is to be gained by any attempt

simplistically to call the juvenile court proceeding either 'civil' or 'criminal.'  The [United States

Supreme] Court carefully has avoided this wooden approach."  *McKeiver v. Pennsylvania*, 403

U.S. 528, 541 (1971).

Officer Soisson's understanding of the law was neither unfounded nor inherently

unreasonable.  When asked at his deposition for the basis of his understanding that a minor's

possession of a vaping device was an "arrestable offense," Officer Soisson pointed to his

"training and experience."  (Doc. No. 39-1 at PageID 423-24.)  He recounted "multiple reports

and calls at the Springfield High School for vapes, where [students] get charged . . . [and]

15

multiple incidents at the skating rink where juveniles have been charged with it[.]" (*Id.*) N.H. did not submit evidence to contest or disprove Officer Soisson's understanding of how prior incidents of minor tobacco possession were handled in local schools or the skating rink.

And even if Officer Soisson misunderstood or overstated the effect of Section 2151.87, his error on a conceptual question of law was not tantamount to a Fourth Amendment violation. "[T]he Fourth Amendment tolerates reasonable mistakes with respect to an officer's 'quick decision' about the scope of the law. In this setting, when an officer reasonably misinterprets the meaning of state law, there is 'no violation of the Fourth Amendment in the first place.'" *Barrera*, 12 F.4th at 621 (6th Cir. 2021) (quoting *Heien v. North Carolina*, 574 U.S. 54, 66 (2014)). "Just as a reasonable mistake of fact does not violate an individual's Fourth Amendment rights, so a reasonable mistake of law does not violate them either." *Id.* "To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection." *Heien*, 574 U.S. at (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)); *cf. J Mack LLC v. Leonard*, No. 2:13-CV-808, 2015 WL 519412 (S.D. Ohio Feb. 9, 2015).

In response to Officer Soisson's investigatory inquiry, N.H. was not truthful. She pressed the officer on why he wanted the vape, prompting him to ask her age. N.H. told Officer Soisson she was "old enough." But under Ohio law she was not old enough to possess this tobacco product out in public unaccompanied by a parent or guardian. Ohio Rev. Code § 2151.87(B). N.H. admitted during deposition that she knew (or believed) that it was illegal for her to possess the vape. Further, in the moments just before and just after they exited the rink, N.H. apparently did not obey Officer Soisson's commands. N.H. attempted to walk away from his investigatory stop. She did not proceed to step outside as directed. She did not put her hands behind her back

when directed.  Nothing in N.H.'s summary judgment papers contradicted those asserted facts that she did not immediately obey those commands.

Those actions themselves could justify an arrest.  *See generally* Ohio Rev. Code §§ 2921.13(A)(3) & 2921.32(A)(5); *State v. Bailey*, 644 N.E.2d 314 (Ohio 1994); *In re M.H.*, 169 N.E.3d 971, 978 (Ohio Ct. App. 1st Dist.), appeal not allowed, 170 N.E.3d 897 (Ohio 2021).  In *M.H.*, police responded to a call of unruly juveniles at a retail store, one of whom threw candy at the store clerk.  Police saw teens walking outside by the store.  Police got out of their car and twice directed the defendant to "come here."  N.H. initially refused.  When the officer got to the defendant, the officer placed his hand on her arm.   At this point, she began physically resisting. She was adjudicated delinquent for obstruction of official business in violation of Ohio Rev. Code § 2921.31(A).  "Ohio courts have . . . held that moving away from and physically resisting officers is sufficient to support a conviction for obstructing official business."  *Id.* at 980.

Because Officer Soisson had probable cause at this point to place N.H. under arrest, it was neither unreasonable nor a Fourth Amendment violation for Officer Soisson to handcuff N.H. and place her in a police vehicle.  Such steps are permissible incident to arrest.  *See generally Neague v. Cynkar*, 258 F.3d 504, 508 (6th Cir. 2001) (holding that "when there is no allegation of physical injury, the handcuffing of an individual incident to a lawful arrest is insufficient as a matter of law to state a claim of excessive force under the Fourth Amendment").

### 4.  Fourth Amendment – Excessive Force

"An officer's use of force 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,' given the fact that 'police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."

17

*LaPlante v. City of Battle Creek, Michigan*, 30 F.4th 572, 579 (6th Cir. 2022) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)).  Whether an action was "objectively reasonable" in light of clearly established rules is "a fact-specific, case-by-case" inquiry focused on "whether a reasonable official in the defendant's position could have believed that his conduct was lawful, judged from the perspective of the reasonable official on the scene."  *Marcilis v. Twp. of Redford*, 693 F.3d 589, 598 (6th Cir. 2012) (quoting *Cohran v. Gilliam*, 656 F.3d 300, 306 (6th Cir. 2011)).

The Supreme Court has instructed that a court weighing a summary judgment motion on a Fourth Amendment claim should not indulge a version of facts that is belied by body camera video footage capturing an officer's interaction with a suspect.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007).  The Sixth Circuit has relied on body camera footage in the record when evaluating a Section 1983 excessive force claim.  *See, e.g., Aldridge v. City of Warren, Mich.*, 682 Fed. App'x 461, 464 (6th Cir. 2017).  "Because facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts, we may not adopt a version of the facts that is blatantly contradicted by video footage that is not doctored or altered in any way and which clearly depicts . . . [the events that] actually happened."  *LaPlante*, 30 F.4th at 578 (quoting *Scott*, 550 U.S. at 378-80).

> The video evidence shows that the deputies' actions involved placing the handcuffs on [plaintiff], lifting her into the cruiser in the middle of her panic attack, wiping her nose, and removing the handcuffs.  It also shows that [plaintiff] never complained about the handcuffs.  The amount of force that the deputies used was not excessive.  The district court did not err in granting summary judgment to County Defendants on the . . . Fourth Amendment excessive force claim.

*Peroli v. Huber*, No. 21-3203, 2021 WL 5411215, at *9 (6th Cir. Nov. 19, 2021).

N.H. alleged that Officer Soisson used excessive force "in violently grabbing N.H., from behind, pushing her out of the door, putting tight handcuffs on her and throwing her into the

backseat of a police cruiser," and in "turning up the heat in the vehicle and refusing to crack the window while N.H. was inside, putting N.H. in a dangerous position (knowing she had passed out)." (Doc. No. 31-1 at ¶¶ 46-47.) The Court considers those contentions in turn.

### a) Initial Interaction

Plaintiffs' first allegation of excessive force was that Officer Soisson "violently grabb[ed] N.H. from behind," and "push[ed] her out the door." (Doc. No. 31-1 at PageID 140.) Officer Soisson acknowledged that he "clearly pushed N.H. outside, [but] the amount of force used to do so was *de minimis*." (Doc. No. 37 at PageID 308.) Officer Soisson directed the Court to the body camera video to support his position. (*Id.* at PageID 309.) Plaintiffs contended Officer Soisson's description misstated what occurred. Rather, they argued that Officer Soisson's force was "grossly disproportionate to N.H.'s conduct." (Doc. No. 42 at PageID 1026.)

"An officer making an investigative stop or arrest has the right to use some degree of physical coercion or threat thereof to effect it." *Miller v. Sanilac Cnty.*, 606 F.3d 240, 251 (6th Cir. 2010) (citation omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (internal citation and quotation marks omitted). "The central inquiry is whether, 'under the totality of the circumstances, the officer's actions were objectively reasonable.'" *Bolden v. City of Euclid*, 595 F. App'x 464, 470 (6th Cir. 2014) (quoting *Fox v. DeSoto*, 489 F.3d 227, 236-37 (6th Cir. 2007)).[3]

---

[3] "Among the most important factors to consider in determining the objective reasonableness of the force used are: 1) the severity of the crime at issue; 2) whether the suspect posed an immediate threat to the safety of the police officer or others; and 3) whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Grawey v. Drury*, 568 F.3d 302, 310 (6th Cir. 2009) (citations omitted).

The Sixth Circuit's reasoning in *Bolden* is instructive here. The officer believed plaintiff was committing a relatively minor offense. While the plaintiff may not have posed a danger to the officer or others, the plaintiff disregarded the officer's commands. The Sixth Circuit observed that the officer was justified "in using some force . . . to secure a non-complaint" juvenile. 595 F. App'x at 470. Further, the absence of physical injury to the plaintiff supported the conclusion that the force used was not excessive. *Id.* at 471.

N.H. argued that because there was not probable cause to arrest her, it follows that handcuffing her was unreasonable *per se*. Doc. No. 42 at PageID 1027 (citing *Livecchi v. City of Geneva*, No. 14-CV-5215, 2019 WL 315293 (W.D.N.Y. Jan. 24, 2019).) As discussed previously, neither the detention nor the arrest were violations of the Fourth Amendment – even if Officer Soisson misunderstood or mischaracterized the nature of a minor's tobacco possession. Even if not a crime, N.H. was in "violation" of the Ohio juvenile law, Ohio Rev. Code § 2151.87(B)(1), and Officer Soisson was allowed to place her in custody and release her to her parent or an authorized adult, *id.* §§ 2151.31(A)(6)(a) & 2151.311(A)(1). The use of handcuffs was permissible during such a custodial or investigatory detention. *See generally Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 309 (6th Cir. 2005).

In any event, "the lawfulness of an arrest is irrelevant to an excessive force analysis." *Sebright v. City of Rockford*, 585 F. App'x 905, 907 (7th Cir. 2014) (collecting authorities); *cf. Est. of Sowards v. City of Trenton*, 125 F. App'x 31, 41 (6th Cir. 2005). Indeed, the reasonableness test established in *Graham v. Connor*, 490 U.S. 386, 396 (1989), "remains the applicable test for determining when excessive force has been used, including those cases where officers allegedly lack probable cause to arrest." *Jones v. Parmley*, 465 F.3d 46, 62 (2d Cir. 2006).

20

N.H. disregarded Officer Soisson's commands to step outside by turning to walk back into the skating rink.  She did not initially hand over the device as she was instructed to do.  N.H. misrepresented her age.  Once outside the rink, N.H. turned as if to walk away again back into the rink.  N.H.'s repeated refusal to comply with Officer Soisson's orders justified some use of force.  That Officer Soisson physically escorted N.H. out of the rink and handcuffed her were objectively reasonable uses of minimal force.  (*See* Soisson Body Cam at 24:04-24:53.)

### b)      Handcuff Tightness

The Fourth Amendment prohibits unduly tight or excessively forceful handcuffing during the course of a seizure.  *Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009).  This right was "clearly established" at the time of N.H.'s arrest.  *See id.* (noting this right was clearly established during a seizure in 2002).  "In order for a handcuffing claim to survive summary judgment, a plaintiff must offer sufficient evidence to create a genuine issue of material fact that: (1) he or she complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced "some physical injury" resulting from the handcuffing."  *Baynes v. Cleland*, 799 F.3d 600, 608 (6th Cir. 2015) (citing *Morrison*, 583 F.3d at 401)).

N.H.'s excessive use of force claim on this argument plainly fails.  She did not show any physical injury from the handcuffs or that Officer Soisson ignored N.H.'s complaint that the handcuffs were too tight.  (Doc. No. 37 at PageID 309.)  N.H. pointed to nothing in the record that would support her allegation that she suffered any physical injury from the handcuffs.  Notably, N.H. also conceded that she never told Officer Soisson that the handcuffs were too tight.  (Doc. No. 34-2 at PageID 257.)

21

### c) Placing N.H. in Car

N.H. claimed that she was thrown into the back seat of the police cruiser.  (Doc. No. 31-1 at PageID 140.)  Officer Soisson argued that the body camera footage "directly contradicts this assertion," because he "guide[d] her into the back seat area" and she sat without assistance or contact.  (Doc. No. 37 at PageID 310.)

The body camera footage belies N.H.'s allegation.  N.H. did, in fact, get into the car on her own.  (*See* Soisson Body Cam at 24:11-55.)  She acknowledged as much in her deposition: "But I still got in on my own, yes.  He didn't completely force me."  (Doc. No. 34-2 at PageID 239.)  Officer Soisson's hand guiding her into the car does not amount to force that is excessive. *See Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *see also Peroli v. Huber*, No. 1:19-CV-1755, 2021 WL 308102, at *6 (N.D. Ohio Jan. 29, 2021), *aff'd,* No. 21-3202, 2021 WL 5411215 (6th Cir. Nov. 19, 2021).

Because the body camera footage shows that Officer Soisson did not exercise force in placing N.H. into the police car, and because she conceded as much in deposition testimony, N.H.'s excessive force claim in this regard fails as a matter of law.

### d) Heat in Car

The final allegation of excessive force was that Officer Soisson "turn[ed] up the heat in the vehicle and refus[ed] to crack the window while N.H. was inside," which resulted in N.H. passing out.  (Doc. No. 31-1 at PageID 140.)

Subjecting a detainee to a hot police car could constitute excessive force.  *Burchett v. Kiefer*, 310 F.3d 937, 946 (6th Cir. 2002).  The Supreme Court held in *Hope v. Pelzer* that prison officials violated the Eighth Amendment by exposing a prisoner to the sun for seven hours while

22

handcuffed to a hitching post.  536 U.S. 730, 738 (2002).  Applying *Hope*, the Sixth Circuit held

that a post-arrest detention in a police vehicle "with the windows rolled up in ninety degree heat

for three hours constituted excessive force" under the Fourth Amendment.  *Burchett*, 310 F.3d at

945.

The Fifth Circuit has held that a post-arrest detention for approximately one-half hour in

an unventilated police vehicle in the sun was not in violation of the Fourth Amendment.  *Glenn*

*v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001).  In addition, a district court in New York

found no Fourth Amendment violation where a suspect was left in police vehicle for ten minutes

in a hot car but suffered no injuries.  *Esmont v. City of New York*, 371 F.Supp.2d 202, 214

(S.D.N.Y. 2005).  Similarly, a Nevada district court granted summary judgment to police officer

defendants where a plaintiff was left in the car for 17 minutes, offered no evidence that he was

injured, and that he was only left waiting as long as was needed for officers to change shifts.

*Kanvick v. City of Reno*, No. 3:06-CV-00058, 2008 WL 873085, at *11–12 (D. Nev. Mar. 27,

2008) *aff'd sub nom. Kanvick v. Reno City Police*, 339 Fed. App'x 745 (9th Cir. 2009).  "In sum,

in cases where confinement in a vehicle amounted to excessive force, the exposure has been

prolonged (*i.e.*, three hours in *Burchett*, 310 F.3d at 945).  In contrast, federal district courts have

found that force was not excessive when the confinement lasted thirty minutes or less." *Arias v.*

*Amador*, 61 F. Supp. 3d 960, 975-76 (E.D. Cal. 2014).

Here, N.H. was in the police car in the evening – not during the daytime.  (*See* Doc. No.

34-2 (N.H. acknowledging she arrived at the rink around 7:30 p.m.).)  The record indicates that

the temperature at the time was around 72 degrees.  (*See* Doc. No. 45-1.)  There is no allegation

or suggestion that N.H. was in the car for even one hour – much less three.  As a result, the facts

here do not rise to the level of what apparently occurred in *Burchett*.

Another deficiency with N.H.'s hot car claim was the absence of citation to record evidence in her summary judgment papers.  N.H.'s opposition brief indicated that she was handcuffed in the car for over 40 minutes (Doc. No. 42 at PageID 1031), at some point "patrol car with the heat at full blast," (*Id.* at PageID 1015).  But there was no citation to anything in support of those fact assertions.  N.H.'s brief did not comply with Fed. R. Civ. P. 56(c).  N.H.'s complaint allegation about the time she spent in the car was not evidence that would withstand a motion for summary judgment.  *See generally Ondo v. City of Cleveland*, 795 F.3d 597, 611 (6th Cir. 2015) (holding that "allegations of physical mistreatment are therefore not supported by sufficient evidence to defeat summary judgment" and "Plaintiffs' excessive-force claim fails because of insufficient probative evidence to defeat summary judgment").  Simply stated, N.H. put forward no evidence to indicate how much of her alleged 40 minutes in the car was spent with the heat on.

The record evidence upon which N.H. relied did not support her claim.  N.H. testified she did not know how long she was in the car.  (Doc. No. 34-2 at PageID 240.)[4]  N.H. also testified that, while Officer Soisson turned up the heat, he did not do so all the way up or put it on 'full blast.'  (*Id.*)  At trial, N.H. could not testify to details beyond these because she admitted that "it's like I passed out.  Like I don't remember after he turned the heat up."  (Doc. No. 34-2 at PageID 240.)

Given this record, N.H.'s deposition admissions, and N.H.'s failure to supply citations that comply with Rule 56(c), the Court holds that N.H. has not shown that a reasonable jury could find excessive force.  Even assuming that N.H. was in a car for less than forty minutes on a

---

[4] Officer Soisson estimated that N.H. was in the car for around 20 minutes.  (Doc. No. 39-1 at PageID 435 & 436-37.)

summer night with the heat on, that would not rise to the level of excessive force that violated the Fourth Amendment.

For the reasons above, summary judgment is entered in favor of Officer Soisson on Counts One and Two.

### 5. Fourteenth Amendment – Equal Protection

In Count Three, N.H. alleged a violation of the Equal Protection clause of the Fourteenth Amendment. (Doc. No. 31-1 at PageID 141.) Her claim was that "the white patrons of the roller rink were behaving the same way as N.H." but that Officer Soisson never detained, used force, or arrested those white patrons. (*Id.* ¶¶ 55-57.) Officer Soisson moved for summary judgment arguing that "there is no evidence of a similarly situated Caucasian person who presented the same or similar circumstances as Plaintiff N.H." (Doc. No. 37 at PageID 317.)[5]

"Sometimes the enforcement of an otherwise valid law can be a means of violating constitutional rights by invidious discrimination. To address this problem, courts have developed the doctrine of selective enforcement." *Futernick v. Sumpter Township*, 78 F.3d 1051, 1056 (6th Cir. 1996). "Selective enforcement claims are judged according to ordinary Equal Protection standards, which require a petitioner to show both a discriminatory purpose and a discriminatory effect." *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000). "[I]t is an absolute requirement that the plaintiff make at least a prima facie showing that similarly situated

---

[5] Officer Soisson pointed to his arrest of a white male and issuance of a citation earlier that same evening. (Doc. No. 37 at PageID 316-17.) That person was not at the skating rink and was not arrested in connection with tobacco. (*See id.*) This person was not similarly situated with N.H. and did not fit the description of those who N.H. alleged to be treated better and differently. (*See* Doc. No. 31-1 at PageID 141.) Evidence of this encounter earlier in Officer Soisson's workday would not be grounds for granting summary judgment in his favor. *Cf. Prado v. Thomas*, 2019 WL 1283823, at *6 (S.D. Ohio Mar. 20, 2019) (denying summary judgment where there was no evidence that the comparator engaged in the same conduct as the plaintiff).

persons outside her category were not prosecuted.'  Furthermore, 'there is a strong presumption that the state actors have properly discharged their official duties, and to overcome that presumption the plaintiff must present clear evidence to the contrary; the standard is a demanding one.'"  *Id.* (quoting *Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997)). "A claimant can demonstrate discriminatory effect by naming a similarly situated individual who was not investigated or through the use of statistical or other evidence" showing differential treatment.  *Farm Lab. Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 534 (6th Cir. 2002)

N.H. argued that "a factfinder could conclude N.H. was targeted because of her race." (Doc. No. 42 at PageID 1030.)  She stated that the crowd at the skating rink was predominately white and in possession of vape devices.  (*Id.*)  A similarly situated person in this situation would be someone who was not African American and in open or known possession of a vaping device. N.H. did not identify such a person or offer statistical evidence.  And critically, N.H. conceded in her deposition that Officer Officer Soisson saw her vape pen but "didn't know that . . . other kids in the skating rink had vapes also."  (Doc. No. 34-2 at PageID 232-236.)

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  N.H. did not produce evidence to show that Officer Soisson purposely selected, targeted, or arrested her because of her race.  "As such, Plaintiff has failed to establish an equal protection violation."  *Croskey v. Wheeler*, No. 1:18-CV-1476, 2019 WL 4601670, at *5 (N.D. Ohio Sept. 23, 2019).

N.H. suggested that "a factfinder could conclude that N.H. was targeted because of her race," because Officer Soisson arrested two African American juveniles when the majority of the

26

attendees at the skating rink were white and in possession of vape pens.  (Doc. No. 42 at PageID 1030.)  The Sixth Circuit has held, however, that a plaintiff bringing a selective enforcement claim must do more to demonstrate purposeful discrimination.  In *Gardenshire*, the Sixth Circuit summarized plaintiffs' argument as "the police had no logical reason to prosecute the rather than [the comparator], so the arrest must have been motivated by their interracial marriage."  205 F.3d at 320.  The Sixth Circuit found this to be insufficient and noted that "while such reasoning would be sufficient in establishing a *prima facie* Title VII case, the standard for a selective enforcement claim is much more demanding."  *Id.*

For the reasons above, summary judgment is entered in favor of Officer Soisson on Count Three.

### C.  Failure to Train and Supervise Claim against Village of Lakemore

In Count Four, Plaintiffs alleged that "the Village of Lakemore, through its police department, failed to properly train and enforce their policy and procedure for not disciplining Officer Soisson for his actions against N.H., T.H. and the general community."  (Doc. No. 31-1 at ¶ 61.)  Their claim was that the Village of Lakemore is liable for the actions of Officer Soisson," who they alleged had "a history of violating policies and procedures, several of [which were] not clearly defined or enforced."  (*Id.* ¶¶ 62-64.)

The Supreme Court long ago held that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).  A municipality may be liable under § 1983 for failure to train when it amounts to deliberate indifference.  *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989).

27

To succeed on a failure-to-train claim, a plaintiff must show: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). "Regarding the second prong, a plaintiff most commonly demonstrates a municipality's deliberate indifference by pointing to a failure to act 'in response to repeated complaints of constitutional violations by its officers.'" *Howell v. NaphCare, Inc.*, 67 F.4th 302, 319 (6th Cir. 2023) (quoting *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 287 (6th Cir. 2020)).

But for municipal liability to exist, there must be an underlying constitutional violation. *Voyticky v. Village of Timberlake*, 412 F.3d 669, 679 (6th Cir. 2005). "If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001). "If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

Because this Court has determined that Officer Soisson is entitled to summary judgment "on all of Plaintiff's constitutional claims for want of a constitutional violation, Plaintiff's municipal liability claim must also fail." *Voyticky*, 412 F.3d at 679.

For the reasons above, summary judgment is entered in favor of the Village of Lakemore on Count Four.

### D.  State Law Intentional Tort Claims

Plaintiffs brought claims against Officer Soisson for assault and battery as well as the intentional infliction of emotional distress in Counts Five and Six, respectively.   Officer Soisson did not move for summary judgment on those claims.  Instead, Officer Soisson asserted that this Court should decline to exercise supplemental jurisdiction over those claims.  (Doc. No. 37 at PageID 318.)

 "A district court has broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims.  . . .  When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed."  *Musson Theatrical, Inc. v. Federal Exp. Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996) (citations omitted); *see also United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).

This Court declines to exercise supplemental jurisdiction over the remaining state law claims against Officer Soisson, those being assault and battery (Count Five), intentional infliction of emotional distress (Count Six), and loss of consortium (Count Seven), to the extent the loss of consortium claim derives from the assault and battery or intentional infliction of emotional distress claims.

### E.  Loss of Consortium

In Count Seven, T.H. alleged "that as a result of Officer Soisson's and the Village's actions, she has had to spend a significant amount of time comforting and counseling her daughter, N.H."  (Doc. No. 31-1 at ¶ 75.)

"A loss of consortium claim is a derivative claim."  *McCombs v. Ohio Dept. of Developmental Disabilities*, 187 N.E.3d 610, 628 (Ohio Ct. App. 10th Dist. 2022).  That means

"it 'is dependent upon the existence of a primary cause of action and can be maintained only so long as the primary action continues.' Because of the nature of a derivative action, "[i]t logically follows therefrom that a derivative action cannot afford greater relief than that relief which would be permitted under the primary cause of action.'" *Arch Specialty Ins. Co. v. J.G. Martin, Inc.*, No. 1:06-CV-704, 2007 WL 4013351, at *8 (N.D. Ohio Nov. 15, 2007) (quoting *Messmore v. Monarch Mach. Tool Co.*, 463 N.E.2d 108, 110 (Ohio App. Ct. 9th Dist. 1983)). Where a court has granted summary judgment against a plaintiff and in favor of the alleged tortfeasor, an accompanying loss of consortium claim "cannot stand independently." *McLaughlin v. Andy's Coin Laundries, LLC*, 112 N.E.3d 57, 63 (Ohio Ct. App. 1st Dist. 2018).

Because the Court has granted summary judgment in favor of Defendants on each of the federal causes of action, to the extent that Count Seven sought loss of consortium damages as a derivative remedy for any Section 1983 claims, Count Seven is dismissed to that extent.

Lakemore argued that Ohio's statutory immunity for municipalities would bar the loss of consortium claim as against Lakemore. (Doc. No. 32 at PageID 166-67.) T.H. did not rebut that argument. (Doc. No. 41 at PageID 700-01.) In any event, the only cause of action brought directly against Lakemore – *i.e.*, a Section 1983 *Monell* claim – has now been dismissed. For that reason, the derivative claim in Count Seven against Lakemore is hereby dismissed.

As to Officer Soisson, his motion only sought summary judgment on the loss of consortium claim to the extent it was predicated on a federal tort under Section 1983. (*See* Doc. No. 37 at PageID 318.) Officer Soisson did not move with regard to any loss of consortium claim T.H. might have as a result of a battery or infliction of emotional distress actionable under state law. Accordingly, Count Seven as a derivative claim to the causes of action against Officer

Soisson in Counts Five and Six is a state law claim on which the Court will not exercise supplemental jurisdiction.

### F.  Motion to Strike

Plaintiffs moved to strike the unauthenticated body camera videos of police officers Hinerman and Barauskas as well as the statements in Officer Soisson's affidavit regarding straight arm bar lock techniques that referred to an unauthenticated YouTube video.  (Doc. No. 42 at PageID 1018.)

This Court has not relied on any of those disputed materials.  Accordingly, Plaintiffs' motion to strike is hereby denied as moot.

### G.  Motion for Leave to File Sur-Reply

Plaintiffs filed a motion for leave to file a short sur-reply to respond to new arguments in Officer Soisson's reply brief regarding Ohio law on minors and tobacco possession.  The Court has reviewed and considered both Officer Soisson's reply and Plaintiffs' proposed sur-reply. Accordingly, Plaintiffs motion for leave to file is granted.

### III.  Conclusion

For the foregoing reasons, the Court hereby ORDERS as follows:

A.  Plaintiffs' motion for leave to file a sur-reply (Doc. No. 48) is GRANTED.

B.  Plaintiffs' motion to strike (Doc. No. 42) is DENIED as moot.

C.  Officer Soisson's amended motion for summary judgment (Doc. No. 37) is GRANTED on Counts One, Two, and Three.

D.  The Village of Lakemore's motion for summary judgment is GRANTED on Counts Four and Seven.

E.  The Court declines to exercise supplemental jurisdiction over Counts Five and Six.

F.  The Court further declines to exercise supplemental jurisdiction over Count Seven to the extent Count Seven is a derivative claim to the state law causes of action brought against Officer Soisson.  Count Seven is dismissed as a matter of law to the extent it is predicated on the federal claims brought against Officer Soisson and summarily dismissed herein.


**IT IS SO ORDERED.**


Date:  July 26, 2023

_____
BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE